IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

JAMES A. LEWIS,

                      Plaintiff,

   v.                                                  OPINION & ORDER

CHAD HENNEMAN, LORIE IVERSON, and               16-cv-733-jdp
LAURIE NEUROTH,

                      Defendants.

---

Plaintiff James A. Lewis, a prisoner currently incarcerated at the Wisconsin Secure Program Facility (WSPF), brings this lawsuit alleging that defendants, WSPF officials Chad Henneman, Lorie Iverson, and Laurie Neuroth, harassed and disciplined Lewis in retaliation for his complaining about sexual harassment by Henneman. I granted Lewis leave to proceed on First Amendment retaliation and Fourteenth Amendment equal protection claims against defendants. Defendants move for summary judgment. Dkt. 28. Lewis asks for leave to file a sur-reply to address new facts raised in defendants' reply. Dkt. 80. I will grant his motion so that I may consider the full record and arguments.

The record shows that Lewis was subjected to job-related discipline for reasons that might not have been fully legitimate. Henneman in particular may have treated Lewis poorly. But on the legal merits, I must grant defendants' motion for summary judgment. Lewis has not presented evidence that defendants were motivated by Lewis's First Amendment activity, so Lewis's retaliation claims against the defendants fail. Lewis cannot base a class-of-one equal protection claim on a discretionary employment decision, so his claims against Iverson and Neuroth fail. And finally, Henneman is entitled to qualified immunity because it is not clearly

established that Henneman's conduct reports violated Lewis's rights under the Equal Protection Clause.

UNDISPUTED FACTS

The following facts are undisputed, except where noted.

In December 2014, Lewis got a prison job as a kitchen worker in the WSPF kitchen. Defendant Chad Henneman worked in the kitchen as a corrections food service leader; defendant Laurie Neuroth was a food service manager; and defendant Lorie Iverson was the food service administrator.

In March 2015, Lewis received his first performance evaluation from Iverson. She gave him a score of 30 out of 33 possible points, which was "above average." Dkt. 31-1, at 1. Later that month, she promoted him to kitchen worker advanced and gave him a raise, effective March 29. On April 13, Iverson gave Lewis a second raise and backdated it so that it was effective March 29, too. During these early months of work, Lewis got along well with Henneman—Henneman even taught Lewis how to play euchre. Lewis also trained incoming workers. Each defendant agrees that at that time, Lewis was a good worker.

But soon after that, Lewis's work relationship with Henneman began to deteriorate. On April 15, Henneman reported that Lewis "became argumentative, distracting, [and] disruptive at work [and] began to take everything literally when taking directions." Dkt. 31-15, at 3. Lewis agrees that Henneman made this report, but states that Henneman was the one causing problems, not Lewis: Henneman ordered Lewis not to talk to the other inmate workers, and Lewis complied, but Henneman then complained that Lewis didn't tell the other inmate workers when they were making mistakes.

According to Lewis, in May 2015 he was bent over in the kitchen when Henneman saw him and said, "Mmm, Mr. Lewis, what an interesting view." Dkt. 48, ¶ 7. Lewis interpreted this as a sexual comment and "got angry and cursed Henneman out." *Id.* ¶ 8. Defendants say this episode never occurred.

According to Lewis, "[f]rom that moment on, Henneman started harassing" him. *Id.* ¶ 9. For example, Henneman would assign extra tasks to Lewis, especially undesirable tasks like cleaning up after the other kitchen workers. Lewis reported this harassment to Iverson, Neuroth, and Anthony Broadbent (a WSPF unit manager). He also told his daughter, Tiffany Lewis, about Henneman's harassment. Tiffany called Iverson in "May or June of 2015," and Iverson told her "she would handle the situation." Dkt. 57, ¶ 6.

On May 27, Henneman reported in a "behavior log" that Lewis "gets annoyed with work rules in the kitchen or with decisions made by staff then complains loudly and attempts to do what he wants to, not what staff tell him to do." Dkt. 31-15, at 3. The same day, Henneman sent an email to Iverson and Neuroth stating, "Lewis is increasingly becoming hostile and agitated at what he perceives to be slights and his overworking." Dkt. 76-1, at 1.

On June 28, Henneman reported that Lewis "became very animated and disruptive when he smelled gas 10 minutes into his work shift in the kitchen and began pleading with staff to send him back." Dkt. 31-15, at 3.

On July 30, Henneman reported that Lewis "can have very good work performances when he wants to work [but] at other times, is very slow and intentionally slow to get out of work." *Id.* The same day, Henneman wrote Lewis a conduct report and sent him back from work "for becoming a disruption and for arguing with staff." *Id.* Lebbeus Brown, a WSPF

3

captain, reviewed the conduct report, including Lewis's statement contesting Henneman's accusations, and found Lewis guilty of inadequate work performance and disruptive conduct.

In early August, Lewis filed a grievance complaining of Henneman's "harassment and unfair treatment." Dkt. 31-3, at 6. The grievance was rejected as outside the scope of the grievance procedure—in other words, Lewis should have appealed the conduct report rather than written a grievance about it. Sometime that same month, Lewis's daughter Tiffany called Iverson a second time; Iverson "explained that [Lewis] and Mr. Henneman just had a personality conflict." Dkt. 57, ¶ 7.

On August 25, Henneman yelled at Lewis about a mistake until another inmate worker admitted that he made the mistake. On August 26, Henneman reported that Lewis "does not take orders well." Dkt. 31-15, at 3.

On August 31, Lewis filed another grievance, complaining that on August 25 he "was again the target of Mr. Henneman's bullying." Dkt. 31-4, at 5. The inmate complaint examiner spoke to Iverson about the grievance and rejected the grievance as moot because Iverson said she "already addressed this issue." *Id.* at 3.

On October 7, Henneman reported that Lewis "does not make good use of his time, attempts to leave work early so that he can go to law library even though he is still scheduled to be at work." Dkt. 31-15, at 2. According to Lewis, another corrections food service leader had told Lewis that he could leave work early to go to the law library but Henneman refused to allow Lewis to leave, even though Lewis completed his assigned tasks.

The same day, Lewis submitted a psychological services request stating,

> A staff member made what I took to be an inappropriate sexual remark to me. After I told him in so many words I didn't appreciate it I've become the object of his harassment. I don't know if it's because of the rejection or because he feels I would

4

> tell. I dismissed it because I'm not gay and don't want to be thought of as such and he is supposed to carry a lot of weight within the institution. I feel if he continues it'll drive me to kill myself as opposed to having to deal with this.

Dkt. 48-9.

The next day, October 8, Lewis received a response from the psychological services unit directing him to "go to [his] unit manager for issues with staff." *Id.* So Lewis filed another grievance complaining that Henneman "continues to harass me without provocation." Dkt. 31-5, at 10. The grievance was dismissed because it did not allege staff misconduct. The same day, Lewis filed a sexual harassment complaint against Henneman, which initiated an internal investigation under the Prison Rape Elimination Act (PREA). Lewis's complaint focused on the May 2015 "interesting view" episode, although he also accused Henneman of "staring at [his] ass . . . . sometime the first week of September." Dkt. 32-1, at 20.

On October 12, Lewis filed a grievance concerning the psychological services unit's failure to substantively respond to his October 7 request. His grievance was "affirmed with modification," as the psychological services unit "should have reported this incident to Security immediately for a possible PREA investigation." Dkt. 48-10, at 1.

On October 18, Lewis filed a grievance complaining that Henneman was "allowed to continue to work around inmates during" the PREA investigation. Dkt. 31-6, at 11. The grievance was dismissed because Lewis was "removed" from the kitchen during the investigation. *Id.* at 8. Lewis appealed, explaining that he was allowed to return to work on October 26, while the investigation was ongoing. Lewis filed a second grievance on October 18, explaining that several WSPF officials "have all been made aware of inappropriate sexual behavior involving Mr. Chad Henneman" and complaining that they hadn't interviewed two inmate witnesses that Lewis identified. Dkt. 31-7, at 11. The inmate complaint examiner

5

dismissed the grievance after confirming with the PREA investigator that "the allegations made by inmate Lewis in this complaint were investigated." *Id.* at 8. Lewis appealed, arguing that the PREA investigator didn't question several other witnesses. Months later, the corrections complaint examiner affirmed the dismissal of both grievances.

The PREA investigation concluded on November 5. The final disposition was "unsubstantiated," that is, "the investigation produced insufficient evidence to make a final determination as to whether or not the event occurred." Dkt. 32-1, at 1.

In December 2015 and January 2016, Lewis did not work for medical reasons. On the same day he was cleared to return to work, January 26, he learned that the baker position was available in the kitchen. He asked Iverson to promote him to the baker position, but Iverson chose another inmate for the promotion. When Lewis questioned her decision, she explained that she did not promote him because he had just returned to work after being gone for five weeks. Later that day, Iverson asked Lewis to clean some shelves that another inmate kitchen worker had cleaned the day before.

Lewis, upset by Iverson's response, asked Anthony Broadbent, another WSPF official, for help. Broadbent organized a meeting with Lewis and Iverson in late January. During the meeting, Iverson told Lewis that he "was a good worker, that she had no problems with him, [and] that the [corrections food service leaders] spoke highly of him, saying he worked hard." Dkt. 74, ¶ 106. She also told him that "he let things get into his head and he did not let them go and that was negatively affecting his work performance." Dkt. 33, ¶ 14. She told Lewis that she would speak to Henneman.

On February 16, Lewis accused WSPF staff members of being racist (he says he was joking), Iverson told him the comment was inappropriate, Lewis then said "Jesus Christ" or

something similar, and Iverson then sent him back to his cell. Henneman wrote Lewis a conduct report based on the incident. Lewis was found guilty of disruptive conduct, inadequate work performance, and disrespect. He appealed, complaining that when Henneman delivered the conduct report to Lewis's cell, he didn't allow Lewis to view the report or write a statement. Lewis also complained that Henneman had been harassing him in retaliation for filing a PREA complaint. *See* Dkt. 31-8, at 12. The conduct report disposition was affirmed.

On February 17, Lewis received his second work performance evaluation from Iverson. She gave him a score of 18 out of 33 possible points, which was at the high range of "unsatisfactory." Dkt. 31-1, at 2.

On February 24, Lewis filed two grievances accusing Henneman and Iverson of retaliating against him. *See* Dkt. 31-9 and Dkt. 31-10. One focused on the February 16 conduct report; the other focused on the February 17 work performance evaluation. Lewis explained that his poor work performance evaluation contradicted Iverson's praise for his work in the late January meeting. He asked that he receive a new evaluation. Both grievances were rejected as beyond the scope of the inmate complaint review process.

On May 6, another correctional food service leader, Mary Hanson, instructed Lewis to inform Henneman that he would be leaving work to attend church. Lewis did so; Henneman did not respond. Lewis asked Hanson if she had seen Henneman ignore him. Henneman then told Lewis "not to ever disrespect him again." Dkt. 48, ¶ 79. Lewis immediately reported this to Neuroth. Henneman followed Lewis into Neuroth's office and told Neuroth what Lewis had said. Neuroth told Lewis that she "would handle it" and that he could go to church. *Id.* ¶ 83. When Lewis returned from church, he told Iverson about the incident; she said she already talked to Neuroth about it and "they would handle it." *Id.*

7

In late May and early June, the kitchen staff was temporarily reduced during a prison-wide "lock down." *Id.* ¶ 84. Iverson chose Lewis and some other inmate workers to work during this time because "she felt [they] would do the best work in the least amount of time, with the least amount of workers." *Id.* ¶ 88.

The tension between Henneman and Lewis reached a breaking point on June 23. That morning, Henneman assigned Lewis to pack breakfast bags. (Henneman says Lewis complained about this assignment and argued; Lewis says he didn't.) Lewis was using a cart to transport several boxes of food for the breakfast bags. Henneman directed Lewis to carry the boxes, instead. Lewis, who had recently hurt his back while carrying a box of food, told Henneman he would tell Iverson about Henneman's direction. Henneman then asked to speak with Lewis. According to Henneman, Lewis replied, "fuck you." Dkt. 31-11, at 2. According to Lewis, he replied, "OK." Dkt. 48, ¶ 97. Soon after, Henneman told Lewis to return to his cell. According to Henneman, Lewis "became loud and argumentative," and when Henneman told Lewis that Iverson would speak to him when she arrived, Lewis replied, "That's the problem, you always go running to Iverson first." Dkt. 31-11, at 2. According to Lewis, he did not raise his voice or act disrespectfully, but accused Henneman of "sending [Lewis] back so [Henneman] could talk to Iverson first." Dkt. 48, ¶ 98. After Lewis returned to his cell, he asked a family member, Angie Haskins, to contact Iverson to relay his side of the story. Haskins did.

The same day, June 23, Henneman issued Lewis a conduct report detailing Henneman's version of events. Lewis contested the conduct report, stating,

> Mr. Henneman you have been harassing me since I filed that PREA on you. And I never cursed at you. The problem came when I told you I'm telling Miss Iverson on you. That's when you sent me back. This is the fifth [grievance] on you. My family has called three times and talked to Iverson about you harassing me.

8

Dkt. 31-11, at 3. Iverson reviewed the conduct report the same day and found Lewis guilty of disrespect, disruptive conduct, and inadequate work performance. Lewis appealed; the conduct report was affirmed because "there exists no evidence to support" Lewis's claim that Henneman "lied or fabricated the conduct report." *Id.* at 4.

The same day, June 23, Iverson completed another work performance evaluation for Lewis. She gave him a score of 20 out of 33 possible points, which was at the low range of "satisfactory." Dkt. 31-1, at 3. But because Lewis had received one work-related conduct report since his last evaluation, his score was dropped to 17, which was unsatisfactory. Iverson recommended that Lewis be terminated from his position because of "two poor work evaluations." *Id.* Lewis objected to the evaluation, stating,

> Ms. Iverson is siding with Henneman without talking to me or the officer to get the truth of the matter. I did nothing to cause this. This is retaliation from Henneman for the PREA report I filed.

*Id.* Lewis was then terminated from his job in the kitchen. He filed two grievances accusing Henneman of retaliating against him; they were rejected. He later filed a third grievance complaining that his PREA investigation report was not updated to include the retaliation allegations; that grievance was also rejected.

Finally, defendants point out, and Lewis does not dispute, that Lewis occasionally had problems with other kitchen staff, too. On June 9, 2015, another staff member reported that Lewis was "directed not to ask personal questions" of kitchen staff. Dkt. 41-15, at 3. In September 2015, another staff member sent Lewis back from work "for being argumentative and disruptive." *Id.* (It's not clear whether this happened once or two days in a row.) On March 5, 2016, another WPSF reported that Lewis was "taking [direction] as literally as possible." *Id.* at 2.

ANALYSIS

Defendants move for summary judgment on all of Lewis's claims. To succeed on their motion for summary judgment, defendants must show that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law on the merits. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Brummet v. Sinclair Broad. Grp., Inc.*, 414 F.3d 686, 692 (7th Cir. 2005). All reasonable inferences from the facts in the summary judgment record must be drawn in Lewis's favor as the nonmoving party. *Baron v. City of Highland Park*, 195 F.3d 333, 338 (7th Cir. 1999). If Lewis fails to establish the existence of an essential element on which he will bear the burden of proof at trial, summary judgment for defendants is proper. *See Celotex*, 477 U.S. at 322.

**A. Retaliation claims**

To prevail on his First Amendment retaliation claims, Lewis must show that (1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter a person of "ordinary firmness" from engaging in the protected activity; and (3) the First Amendment activity was at least a "motivating factor" in defendants' decisions to take those actions. *McGreal v. Village of Orland Park*, 850 F.3d 308, 312 (7th Cir. 2017). Here, the parties agree that Lewis's grievances and PREA complaint are protected by the First Amendment, and that the conduct reports and poor work performance evaluations that Lewis received—which led to his being fired, in addition to other discipline—would likely deter a person from filing grievances and complaints in the future. So the question is whether a reasonable juror could find that each defendant's actions were motivated by Lewis's grievances.

I conclude that Lewis has not produced evidence that would allow a reasonable jury to infer than any defendant was motivated by retaliatory intent. Lewis is entitled to rely on "[c]ircumstantial proof, such as the timing of events . . . to establish the defendant's retaliatory motive." *Massey v. Johnson*, 457 F.3d 711, 716–17 (7th Cir. 2006). But "suspicious timing alone is rarely enough to create an inference of retaliatory motive," *Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010, 1021 (7th Cir. 2016), because "[s]uspicious timing may be just that—suspicious—and a suspicion is not enough to get past a motion for summary judgment." *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012) (quoting *Loudermilk v. Best Pallet Co.*, 636 F.3d 312, 315 (7th Cir. 2011)). There may be times when a protected activity and an adverse reaction are so close in time that a jury may reasonably infer that the two are linked, but these situations are typically limited to when the two events are "no more than a few days" apart. *Id.*

For the most part, all Lewis points to is suspicious timing—and the timing isn't that suspicious. Henneman's first negative interaction with Lewis occurred *before* the alleged sexual harassment took place. It wasn't until a month after Lewis told Iverson and Neuroth about Henneman's sexual harassment that Henneman issued Lewis a conduct report. The next conduct report (and Iverson's first poor work performance evaluation) came about four months after Lewis filed his PREA complaint. The final conduct report and poor work performance evaluation came about four months after Lewis filed a grievance against Henneman and Iverson. In between these incidents were numerous instances of Henneman acting unfairly to Lewis—yelling at him, assigning him extra tasks, giving him bad reports—but these events still aren't close enough to Lewis's grievances and complaints to allow a reasonable jury to infer that they are linked.

11

Viewing the evidence in the light most favorable to Lewis, it does appear that Henneman issued Lewis his final conduct report on June 23 for a pretextual reason, which may be circumstantial evidence of retaliatory motive. *See Gracia*, 842 F.3d at 1020–21. But without any evidence that Henneman's true reason was to retaliate against Lewis's First Amendment activity, Lewis has not provided "a legally sufficient evidentiary basis upon which a reasonable jury could find retaliatory motive." *Id.* at 1021.

Lewis also points to evidence that Henneman was known by other staff and inmates to harass and bully other staff and inmates. *See generally* Dkt. 37-2. Among the most unfavorable evidence is a WSPF official's report that Henneman "wanted to get rid of" another staff member and asked other staff to "help [him] get rid of" her. *Id.* at 75–76. The same official commented, "If [Henneman] doesn't like someone, he is going to make trouble." *Id.* at 76. Under Federal Rule of Evidence 404(a), I cannot consider "character" evidence to determine whether Henneman acted in accordance with a particular character trait. But regardless, this evidence still doesn't speak to the pertinent question: whether Henneman issued the conduct reports *because of Lewis's grievances and PREA complaint.* General harassment and bullying does not amount to retaliation.

Lewis has not produced any evidence linking defendants' adverse actions to Lewis's First Amendment activity, so I will grant summary judgment in defendants' favor on Lewis's retaliation claims.

## B. Equal protection claims

Lewis also brings class-of-one equal protection claims against defendants. An ordinary equal protection claim alleges that the plaintiff has been denied equal treatment because of his membership in an "identifiable group." *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 601 (2008).

A class-of-one equal protection claim, on the other hand, alleges that the plaintiff has been denied equal treatment for no rational reason. *D.S. v. E. Porter Cty. Sch. Corp.*, 799 F.3d 793, 799 (7th Cir. 2015) (citing *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)). The required elements of class-of-one claims are not entirely clear, as explained in *Del Marcelle v. Brown County Corp.*, 680 F.3d 887, 891 (7th Cir. 2012) (affirming dismissal of a class-of-one claim by an evenly divided court). To prevail on his class-of-one claims, Lewis must show, at a minimum, that (1) defendants intentionally treated him differently from others similarly situated and (2) that there was no rational basis for the difference in treatment. It is an open question whether Lewis must also allege that the differential treatment was not merely arbitrary, but motivated by an improper purpose or "reasons of a personal character." *Id.* at 893, 899 (Posner, J., plurality opinion); *see id.* at 917 (Wood, J., dissenting).

It's also not entirely clear whether class-of-one claims are ever "cognizable in the prison disciplinary context." *Talioferro v. Hepp*, No. 12-cv-921, 2013 WL 936609, at *6 (W.D. Wis. Mar. 11, 2013) (collecting cases). As the United States Supreme Court explained in *Engquist*,

> There are some forms of state action . . . which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments. In such cases the rule that people should be 'treated alike, under like circumstances and conditions' is not violated when one person is treated differently from others, because treating like individuals differently is an accepted consequence of the discretion granted. In such situations, allowing a challenge based on the arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise.

553 U.S. at 603 (quoting *Hayes v. Missouri*, 120 U.S. 68, 71–72 (1887)). Thus, the Supreme Court held that public employees cannot bring class-of-one claims concerning their employment because "employment decisions are quite often subjective and individualized." *Id.* at 604.

13

Thus, *Engquist* bars Lewis's claims against Neuroth and Iverson, whose only allegedly discriminatory acts were taken in the employment context. Their decisions about when and how to complete Lewis's work performance evaluations, which are the focus of Lewis's claims, were just the sort of "subjective and individualized" decisions that are not amenable to a class-of-one equal protection analysis.

That leaves Lewis's claims against Henneman, which focus on Henneman's issuance of conduct reports. Whether the issuance of a conduct report is the sort of discretionary act that cannot form the basis of a class-of-one claim is a tough question, and one that I need not answer in light of defendants' qualified immunity defense. Once a government official raises a qualified immunity defense, a plaintiff must show that (1) he suffered a violation of a statutory or constitutional right; and (2) the law was "clearly established at the time of the alleged violation." *Figgs v. Dawson*, 829 F.3d 895, 905 (7th Cir. 2016) (quoting *Campbell v. Peters*, 256 F.3d 695, 699 (7th Cir. 2001)). A constitutional standard is "'clearly established' when 'various courts have agreed that certain conduct is a constitutional violation under facts not distinguishable in a fair way from the facts presented in the case at hand.'" *Id.* (quoting *Campbell*, 256 F.3d at 701). A plaintiff need only show that "a reasonable official would understand that what he is doing violates that right." *Lewis v. McLean*, 864 F.3d 556, 566 (7th Cir. 2017) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

As the discussion above indicates, courts are not in agreement that discriminating against an inmate in the prison disciplinary context for no rational reason—but not for the inmate's membership in an identifiable group—violates the inmate's rights under the Equal Protection Clause. Rather, as Judge Wood explained in *Del Marcelle*, "[q]ualified immunity will . . . frequently relieve state actors of the burden of litigation in this area [of class-of-one claims]:

14

if discretion is broad and the rules are vague, it will be difficult to show both a violation of a constitutional right and the clearly established nature of that right." 680 F.3d at 915. So regardless whether Henneman violated Lewis's equal protection rights, he is entitled to qualified immunity, and I will grant summary judgment in defendants' favor on Lewis's equal protection claims.

ORDER

IT IS ORDERED that:

1. Plaintiff James A. Lewis's motion for leave to file a sur-reply, Dkt. 80, is GRANTED.

2. Defendants' summary judgment motion, Dkt. 28, is GRANTED.

3. The clerk of court is directed to enter judgment accordingly and close this case.

Entered May 24, 2018.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge